Case No. 18-1335, Pharmaceutical Manufacturing Systems Services, Inc. Petitioner v. Food and Drug Administration, et al. This case for the Petitioner is Carol B. Fox. Please stand by for a moment of silence. Good morning, and may it please the Court, Elizabeth Pepes for Petitioner PMRS. Please stand by for a rebuttal, please. My client is a businessman who represented himself and his company in the FDA proceedings in this case which concern drug labeling at the heart of the opioid crisis and should have been a straightforward administrative proceeding. Five years, 10,000 plus pages, millions of dollars later, FDA has denied his application for what would have been the only opioid on the market that includes label limitations the CDC recommended after seeing science linking duration and dosage to death. Review of this order presents Heartland, Ethylcor, and State Farm issues for the Court because the order on its face reads reasonably. What I would like to do today is cover two fundamental APA violations that are inherent in the order and with the Court's guidance, I hope we can work together to unpack, to understand what really went on in this proceeding. The first violation reflects the FDA's unwillingness to engage in chronic labeling issue that's at the heart of the crisis under the CDC studies, but the agency does not want to engage because it has approved these labels for 14 years. It's the first and primary State Farm issue, APA issue in this case, and it arises out of the FDA's application of Section 505D of the FD&C Act under the very standard in their order and brief, and that standard is at the order appendix 22 to 23 and in their brief at 22. They say the issue here, the only one they've presented to the Court under Chenery, is whether our label, our draft label, falsely suggests that our product is safer than conventional formulations with respect to the risk of abuse. That's the standard they give. What our client did in this record, starting in April 2017, in the very label they cite, appendix 66-67, is said our product, we believe, is safer for two reasons. We have some physical and chemical properties that can deter abuse, and we are the only product that would include that CDC-endorsed label indication. Ms. Lopez, I thought the FDA's position was that there was no evidence that the dye in the solution would actually deter abuse. You're exactly right, Your Honor, and I'm glad you raised it. If I may unpack that, we briefed it. I think we can dispose of the entire order if we look hard at the record on that issue. What I want to say about that first, just for the record, is the FDA does say this whole case stands or falls on the fact that we put in no evidence whatsoever that the dye would deter an actual drug abuser out there in the world from injecting our formulation or sorting it. Two top-line things, and then I'll move on to the real evidence that I think will move the Court, I hope, the way it moved me. The first point is, that's not the question. The statutory question is the one at 22 to 23 and 22 of their brief. It's the product offering as a whole, say, for now. They say that all goes down to this dye question. They say in their brief, all we rely on is the dye. That's not true. They're rewriting the question, and what they're really doing is an APA violation there. But just on the evidence, what I want to say, and this was really compelling to me when I went through the record, but it took some unpacking, is let's spot them then. That this case is really that all we did was the dye, and that we didn't connect it to user reaction. Statute doesn't require connections to user reactions, right? That's from their guidance, because we can't predict how a user is going to react. But let's spot them that that was even the issue. Their point that there was no evidence is flatly belied by the record, and if the Court has a moment, I think it's worth looking. This is Joint Appendix 66 to 67 is the label that they say fails this test, right? But in the first sentence of that label, or the first sentence that I'm focusing on, it says essentially that the drug is formulated with inactive ingredients that make the capsule more difficult to manipulate for misuse and abuse. And I guess the EPA's point is that that's false and misleading because there is no clinical evidence to support the fact, as Judge Raul has mentioned, that this is going to deter abuse. I'm with you 100%, so let's start right there. That's exactly what it says. Now, note, right below that in that label, it says we're not claiming any clinical abuse. So now they have to go, there's no evidence at all in the statement you just read. And that's what I take their position to be, right? That we have no evidence at all that there's anything physical or chemical that would deter the abuse. Here's where I'll give you the record sites we can walk through, because this is really, I think, incredibly important. Joint Appendix 459 to 60 is where this starts. The applicant put in evidence of these extraction studies that is different than the dye, first and foremost. So you'll see that at Appendix 459 to 60. 459, he talks about the dye selection study that FDA has in its sites. You turn the page to 460, and you see at the bottom of the page this 3-2-P-2-2-1-4-1 extraction study on page 460 of the appendix. My point on these pages is extraction, he did a study that's different than the dye, they are not the same. Now, if we turn to page 473 in the appendix, what you'll see here, and this I found very significant, because FDA says nothing whatsoever about this, on 473 of the appendix, this study, which is contemplated by the statute, because it is a controlled in vitro study, found, and I'm quoting from page 473, the difference in purity results are statistically significant between our client's product and the reference product. And if you turn to page 475, he explains this point and relates it to abuse deterrents. He says the percent purity results for our product show that in our capsule, the active pharmaceutical, the thing that you want to get high, cannot be effectively extracted from the formulation matrix, and in Roxycodone, it can. And on 475, he says this is a chemical abuse deterrent. Why? Because it's a solubility issue. If you have a needle and you put five mils of solution in that, but in our product, the active pharmaceutical that gives you the high is the same solubility as the other excipients that don't give you a high, that five mils is filled with less pure API than the competitor product. He put this in the record, and more importantly, if you look at JA 590, this is a page on which he said, this is a factual issue. FAA is not understanding our study or our argument, and we want a hearing on it. And JA 590, note 18, cites exactly the record study I just walked through. Now, they say nothing about this. We are not asking the court to look at the study and agree with the chemistry. We're not asking the court to approve the label of the product. I point this out because there is indeed evidence in this record. We cited page 590 in our opening brief on page 16. You know what? In the FDA's brief, they cited all the pages around that one on pages 16 and 17 of their brief. They cited page 591 of the appendix. They didn't cite page 590. So this is out there. It's a real issue. I raise it because there is evidence. Isn't it addressed in footnote one of the denial? It's not addressed there, Your Honor, at all. What they say there is they kind of brush it off as some sort of definitional issue. But we have record evidence, if you look at 590 and then 897 of the appendix where our client said, this is a factual issue under cases like Edison, cyanamide. If the FDA doesn't think this is good enough evidence to give us the label, fair enough. But we have a factual dispute on what we've shown beyond the dye. More importantly, the client went on to point out to them, we have another what Edison, this court's precedent, called a threshold dispute about whether it's necessary for an applicant to do more than a chemical study to get this kind of label. And our client's position has always been, you need more. Or you don't need more because what they want in that guidance is to go and test how a user might react to it. We don't do pre-market tests by actually injecting people. It's unethical and dangerous. So the only kind of study that we could have done beyond this one was to get a bunch of recreational drug users in a room and you do basically what they call a liking survey, or it's like a survey poll and you say, would you rather inject a clear solution or a dark one? Would you rather inject pure API or, you know, less pure API? And you can get a response. Your client has done that kind of study. I'm sorry? There's that kind of study in the record. No, our client said there's no point to doing that kind of study. It's not scientific or controlled under 505. Now FDA disagrees, but that comes from their guidance. We said you can't apply that as law. And we have a threshold issue under Edison. We should go have a hearing on that. And they said no. That all happened, Your Honor. And the one thing I want to leave the court with and reserve my time is just all of this, the reason this is really important is it gets us over this order. But the real game here is in that CDC indication. I could not emphasize more how important that is. FDA does not want to talk about it because they have this history of approving the chronic label. They approved that label based on a 14-day study back in 1995. The CDC said that is not scientific support for the safety or efficacy of that label that is on every single opioid out in the market today. Ms. Bethesda, isn't that a policy argument more than a legal argument? You know, it's not because we made it as a factual argument in the core of our application here. They've denied us this issue in every forum. You know, the citizen petitions, the other docket, they said you don't have standing. Here we have standing. We made it a core part of our application. We hammered it from that April 2017 J66 to 67, right above the sentences you read, is that acute use indication. They don't want to talk about it because it leads to a very difficult place for the agency. But we need to do more at this point and better than playing administrative gotcha with a pro se applicant to avoid confronting this tough issue. It is a tough one, but we just want a hearing. And all we'd ask is that if this case does get remanded, that it's not just to dicker over the purity study, because that doesn't advance the ball or move the market. It's to have a hearing, fair and square, on this use indication, because that's the issue that we raised. I'll reserve my time. All right, Ms. Carroll. May it please the court, Sarah Carroll on behalf of the government. PMRS proposed the labeling stating that its product, as Judge Wilkins noted, quote, is formulated with inactive ingredients that make the capsule more difficult to manipulate for misuse and abuse. And shortly after that, PMRS proposed to state that in vitro physical and chemical manipulation studies had shown that PMRS' capsules, in comparison to Roxycodone tablets, that's the non-abuse deterrent product on which PMRS relied for safety and effectiveness, had increased resistance to physical and chemical extraction. There was no evidence to support these statements. And in fact, PMRS' study showed that more Oxycodone could be extracted from its product, 98%, than from Roxycodone. That's in footnote one of FDA's order. On appeal, PMRS focuses primarily on this chronic versus acute indication issue, but that issue has no bearing on whether PMRS' statements about the formulation of its product were false or misleading. If a product was labeled for acute use only, and even if the product, if the labeling made some statements about the effect of long-term versus short-term use on the risk that people would become addicted, something like that, that says nothing about the formulation of the product and whether the product can be manipulated physically or chemically to permit abuse through inappropriate means. Here now, PMRS' counsel is relying on parts of the joint appendix that they did not focus on in their brief, but they also don't alleviate the fundamental labeling deficiencies with PMRS' new drug application. For example, JA590, I think the part that PMRS is relying on must just be this paragraph that says that the proposal to refuse the new drug application states, quote, in particular, A, the oxycodone in the formulation can be readily extracted in commonly available solvents into a solution suitable for injection, end quote. This is factually incorrect. But as you noted, Judge Wilkins, FDA did address that and noted that, again, 98 percent of the oxycodone in PMRS' drug could be readily extracted in commonly available solvents. These statements about purity that PMRS is relying on an oral argument, I think that those are just saying, again, something that's addressed in footnote one, which is that PMRS' studies at least purported to show that if you extracted the oxycodone from the capsules, you would also get the excipients, the dye and potentially other inactive ingredients. But nothing about that would preclude someone or there at least was no evidence that that would preclude someone from injecting, you know, the solution excipients and oxycodone and all. So, you know, prescribers and patients rely on drug labeling to make decisions. And here PMRS wanted to label its drug with statements that simply were not supported by the evidence. And the FDA correctly found that under 21 U.S.C. 355 D, which requires it to deny a new drug application if the labeling is false or misleading in any particular, it was required to deny the new drug application. I'm happy to answer questions the court might have. I certainly want to address any concerns you have. But otherwise, I think our brief explains our position. Thank you. We agree completely with what page 66 says. We disagree that there is, quote, no evidence. The J.A. pages I read established that there is indeed evidence. And we did brief this in several places in our opening brief, 11 to 12, I think 16 to 17, 29, 31, reply 10 to 13. We went through this. They cannot make a no evidence argument on that record and footnote. It doesn't hold up. And the other thing is it doesn't cure the major state farm issue here of not looking at the use indication. I mean, I was trying to think of a good analogy right on this issue. I was thinking of maybe like a rollercoaster, a big one and a little one. The rollercoaster is the drug product and the safety restraints are these ADTs or these ADFs. You could have a huge rollercoaster with really good safety restraints and you could have a little tiny rollercoaster with a lap belt. It may well be the case that the smaller one is safer on balance. That's the analogy here. And I think my colleague just said it. Prescribers are looking at these labels. We would take away the label cover for the chronic indication the CDC has said is unsupported in any 505 evidence FDA is running from. It is killing people. How you could say under the statutory standard that FDA cited in its brief at 22 and the order cites at 22 to 23 does the product potentially be safer than a conventional formulation, okay, is the issue. And you can't ignore the use indication. That is a huge state farm problem. How would you respond to the government's arguments about footnote one in the order, you know, with their characterization of PMRS's own studies with respect to solubility? Let's grab it. Just want to make sure I'm looking at the right notes. It's on JA-19. Right. About the purported, right. Yeah. I mean, their argument is we're misunderstanding how that term is used in the context of abuse-deterring opioids, right? So you were suggesting that the drug is less soluble than other drugs, right? So that helps deter abuse. That was, I think, my understanding of some of the appendix sites you were saying. But they're saying that PMRS's studies show that it's actually just as soluble as other drugs. Right. It's just a question of whether you can extract the dye or separate the dye from that. It's actually even more than that, Your Honor. I mean, I'm not a scientist, so. No, we agree completely with them. We're not disputing their study. They're studying the drug. They're only citing half of the loaf. Okay. They're cherry-picking. We agree, and it's next to our purity study, these extraction studies where they say that a person can get more of our active pharmaceutical, the thing that makes you high, in a solution than the other drug. True enough. We say, in counterpoint, the purity point I made, which is, yes, you can get more solution. It's like 98 percent to 90. This is along the appendix sites I gave. But what they ignore is what's right next to it. On the purity study, we say, but, because we made these excipients with the same solubility, when you fill up your needle with five mils of that solution, you only get a much smaller percentage of the API in our solution than from theirs. So, for the shooter, they're not going to get the same high. Now, we're not asking the court to evaluate the science. That is undeniably a factual dispute and perhaps a threshold Edison theory. We're not asking the court to evaluate the science. That is undeniably a factual dispute with the agency on what you have to show to get this label. That compels a hearing under this court's precedence, Edison and Cyanamid. They don't have an answer to that. Okay. So, at a minimum, that's the thing that should go back. And the thing is, I want to stress, though, is that that is not really the issue. They're still going to succeed in dodging a fundamental State Farm issue, a fundamental public health issue, a fundamental fairness issue to this applicant, if that hearing is also not about the use indication. Because under their own interpretation of the statute and what it's supposed to do, see if this market offering makes sense as against others, could it be safer? There's no reason in the world not to consider the very thing my colleague said is important, which is how the prescriber uses these things. If you look at our briefs, this epidemic exists because these things were over-prescribed under lawful mandate from the Federal Drug Administration. That needs to change, and this court's direction is critical on this issue in an APA case, because the FDA doesn't want to deal with it for all the reasons we've briefed. So respectfully, we submit they can't stand on this order under Chenery. In the cases we cite, at a minimum, it requires a hearing under Edison and Cyanamid. Thank you.
judges: Henderson, Wilkins, Rao